ROGERS,
*Appellant,*
*v.*
McBRIDE, et ux,
*Respondents.*

(No. 6572, CA 11802)

600 P2d 895

A. Duane Pinkerton II, Burns, argued the cause for appellant. With him on the briefs was Cramer & Pinkerton, Burns.

Thomas M. Mosgrove, John Day, argued the cause and filed the brief for respondents.

[303]

Before Schwab, Chief Judge, and Richardson, and Roberts, Judges.

RICHARDSON, J.

## RICHARDSON, J.

Plaintiff, a real estate broker, brought this action against defendant (seller) to recover a commission allegedly due on the sale of property. At the close of broker's case seller moved for involuntary nonsuit, which was granted. Broker appeals.

On June 18, 1975, one of broker's salesmen negotiated a nonexclusive listing agreement with seller to sell his ranch. The salesman used a standard exclusive real estate listing agreement and lined out those portions of the form which pertained to an exclusive listing. The agreement provided in material part as follows:

"In consideration of $1.00 in hand paid to the undersigned, receipt whereof is hereby acknowledged, and of your listing for sale and endeavoring to sell the real estate described herein, I hereby appoint you my agent until 6/17/76 to sell said property at the price and on the terms set forth on the reverse side hereof, or any other price and terms which I may approve. * * *

"* * * * *

"I agree to pay you a commission of 5% upon securing a purchaser ready, able and willing to buy said property in accordance herewith * * *

"* * * * *

"A commission shall be considered earned and payable in event of sale at any time within a period of six months after expiration of this listing to any purchaser who has been shown the property or been interviewed concerning the property by Will Rogers Farm Agency during the existence of this listing."

The listed price of the ranch was $407,824.46. The listed terms of sale were cash or 29 percent as down payment, with payment of any balance being negotiable at 6 1/2 percent interest.

On June 27, 1975, broker's salesman showed the ranch to Mr. Molander. However, unknown to broker, seller had agreed earlier that day to sell the ranch to a Mr. Woodard. This sale was arranged through another

broker, Eddy, with whom seller had also listed the property. When informed of that sale, broker requested that seller notify him if the sale did not go through. Seller agreed to do so. Broker informed Molander the ranch had been sold and Molander asked to be notified if the sale fell through.

On July 8, 1975, Molander contacted Eddy regarding the status of the Woodard offer and expressed his desire to purchase the ranch. Eddy had no information regarding the status of the offer. Molander testified he did not at that time have sufficient funds to make the down payment, but that he owned an office building which he contemplated using as the down payment by way of exchange.

Approximately August 18, 1975, Eddy and seller received information that Woodard was not going through with the purchase. The Woodard earnest money agreement was to expire September 3, 1975. Eddy discussed with seller the fact that Molander was interested in purchasing the ranch. Seller did not want to accept the office building as the down payment. Both Eddy and seller knew Molander was broker's client.

During the latter part of August, Eddy called Molander on several occasions. He testified that his purpose was to have Molander assume Woodard's position in the earnest money agreement. He told Molander that the seller was not interested in accepting the office building as an exchange and also that the Woodard sale would probably not be completed.

Subsequently, but before the Woodard earnest money agreement expired, Molander contacted seller directly about purchasing the ranch. They agreed to wait until after September 3, 1975, when Woodard's offer expired, to resume negotiations. Seller never notified broker concerning the status of the Woodard sale.

On November 19, 1975, Molander and seller, without the assistance of a real estate broker, entered into a contract of sale for the ranch. The contract provided for a sale price of $500,979.95, with a down payment of $40,000.

The parties, in their briefs, cite numerous cases discussing the right of a broker to a commission on the sale of property. This case is controlled by *Withers et al. v. Sohrweid*, 198 Or 449, 257 P2d 267 (1953). In that case the seller gave the broker a nonexclusive listing of his property for a price of $45,000. The listing agreement contained the following language:

> " 'In the event that you find a buyer, ready and willing to enter into a deal for said price and terms, or such other terms and price as I may accept, or that you place me in touch with a buyer to whom at any time within 90 days after the termination of this contract I may sell, transfer or convey said property, I hereby agree to pay you in cash for your services in connection with this contract a commission equal in amount to 5% of the sale price of the property. * * *.' " 198 Or at 450.

During the term of the listing agreement the broker presented an offer from a prospect for $40,000. This offer was rejected by the seller. The broker discussed the offer further with the prospective purchasers, but they declined to increase their offer. The broker made no further contact with the prospect. Subsequently, the prospective buyers contacted another broker about the property and a sale for $42,500 was consummated.

From a jury verdict in favor of the broker, the seller appealed, assigning as error the failure of the court to direct a verdict in his favor on the ground of absence of proof. The court reversed, holding that on the facts as presented, the broker had not produced a buyer ready and willing to make a deal on the property. The court quoted from 8 Am Jur 1069, Brokers, § 144, as the applicable principle:

> " 'If a broker, after introducing a prospective customer to his employer to no purpose, abandons his

employment entirely, or if, after procuring a person who proves to be unwilling to accept the terms of his principal, he merely ceases to make further endeavors to negotiate a deal with that particular individual and all negotiations in that direction are completely broken off and terminated, he will not be entitled to a commission if his employer subsequently renews negotiations with the same person, either directly or through the medium of another agent, and thus effects a sale without further effort on the part of the broker first employed. * * *' " 198 Or at 454.

The court discussed the provision of the listing agreement which provided that the broker would be entitled to a commission if he placed the seller in contact with a person who purchased the property within 90 days after termination of the listing contract. The court held that this provision entitled the broker to a commission on a sale made only after termination of the agreement. Thus, if he had simply introduced the seller to a prospective purchaser who ultimately purchased the property during the term of the listing agreement, he was not entitled to a commission because he had not produced a buyer ready and able to purchase.

In the case here at issue, the broker, after being told that the property had been sold, did nothing further toward consummation of a sale. Broker argues the case is distinguishable from *Withers* because he had not abandoned his efforts on behalf of seller but was waiting for seller to notify him if the Woodard sale fell through. Whether broker's conduct can properly be characterized as abandonment in terms of no longer considering Molander as a viable purchaser is not a material distinction. The fact remains that the broker made no further effort to arrange a sale between seller and Molander. We conclude that the trial court did not err in granting the motion for involuntary nonsuit.

Because of our disposition of the first claim of error it is unnecessary to discuss the remaining assignments.

Affirmed.